**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

_____

| | | |
|---|---|---|
| **TRACY WRIGHT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 2:14-cv-02913-STA-dkv** |
| | ) | |
| **MEMPHIS POLICE ASSOCIATION, INC.,** | ) | |
| **MICHAEL WILLIAMS, Individually and in his** | ) | |
| **Official capacity; and** | ) | |
| **ESSICA CAGE-LITTLEJOHN, Individually** | ) | |
| **and in her capacity as supervisor,** | ) | |
| | ) | |
| **Defendants.** | ) | |

_____

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
_____

Before the Court is the Defendants Memphis Police Association, Michael Williams and

Essica Cage-Littlejohn's Motion for Summary Judgment (ECF No. 41) filed on December 21,

2015. Plaintiff Tracy Wright has filed a response in opposition, and Defendants have filed a

reply brief. The parties having completed their briefing, Defendants' Motion is now ripe

determination. For the reasons set forth below, the Motion is **GRANTED**.

## BACKGROUND

Plaintiff's Amended Complaint (ECF No. 14) alleges claims against Defendants under

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, and Tennessee state law, all arising

out of Plaintiff's former employment with Defendant Memphis Police Association. Defendants

now seek judgment as a matter of law on all of Plaintiffs' claims for relief. Pursuant to Local

Rule 56.1(a), Defendants have prepared a statement of facts "to assist the Court in ascertaining

whether there are any material facts in dispute."[1]  A fact is material if the fact "might affect the outcome of the lawsuit under the governing substantive law."[2]  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[3]  For purposes of summary judgment, a party asserting that a material fact is not genuinely in dispute must cite particular parts of the materials in the record and show that the materials fail to establish a genuine dispute or that the adverse party has failed to produce admissible evidence to support a fact.[4]

As the non-moving party, Plaintiff is required to respond to Defendants' statements of fact "by either (1) agreeing that the fact is undisputed; (2) agreeing that the fact is undisputed for the purpose of ruling on the motion for summary judgment only; or (3) demonstrating that the fact is disputed."[5]  Additionally, Plaintiff may "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."[6]  Where Plaintiff asserts that a genuine dispute of material fact exists, Plaintiff must support her contention with a "specific citation to the record."[7]  If Plaintiff fails to demonstrate that a fact is disputed or simply

---

[1] Local R. 56.1(a).

[2] *Baynes v. Cleland*, 799 F.3d 600, 607 (6th Cir. 2015) (citing *Wiley v. United States,* 20 F.3d 222, 224 (6th Cir. 1994) and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)).

[3] *Anderson*, 477 U.S. at 248.

[4] Fed. R. Civ. P. 56(c)(1).

[5] Local R. 56.1(b).

[6] Fed. R. Civ. P. 56(c)(2).

[7] Local R. 56.1(b).

fails to address Defendants' statement of fact properly, the Court will "consider the fact undisputed for purposes" of ruling on the Motions.[8]  Under Rule 56 of the Federal Rules of Civil Procedure, the Court "need consider only the cited materials" but has discretion to "consider other materials in the record."[9]

## I. Defendants' Statement of Facts

### A. The Memphis Police Association

The Court finds that for purposes of Defendants' Motion for Summary Judgment, there is no genuine dispute as to the following material facts, unless otherwise noted.  The Memphis Police Association ("MPA") is a non-profit organization that represents non-supervisory officers of the Memphis Police Department.  (Defs.' Statement of Undisputed Facts ¶ 1.)  The MPA is made up of Executive Officers, Executive Board Members, and MPA members.  (*Id.* ¶ 2.)  The membership of the MPA elects the four (4) Executive Officers: the President, Vice-President, Secretary-Treasurer, and Sergeant at Arms.  (*Id.* ¶ 3.)  Once elected, three (3) of the Executive Officers, the President, Vice-President and Secretary-Treasurer, are assigned by the Memphis Police Department to work full-time at the MPA, although they remain full-time employees of the City of Memphis and continue to be paid salaries by the City of Memphis.  (*Id.* ¶ 4.)  The Sergeant at Arms, does not work at the MPA full-time. (*Id.* ¶ 5.)  Although the Sergeant at Arms may represent MPD officers in disciplinary hearings, he or she continues to serve as a full-time MPD officer.  (*Id.*)  All of the Executive Officers receive salaries paid by the City of Memphis

---

[8] Fed. R. Civ. P. 56(e)(2); *see also* Local R. 56.1(d) ("Failure to respond to a moving party's statement of material facts, or a non-moving party's statement of additional facts, within the time periods provided by these rules shall indicate that the asserted facts are not disputed for purposes of summary judgment.").

[9] Fed. R. Civ. P. 56(c)(3).

and an additional stipend from the MPA, though Plaintiff describes the MPA stipend as salary. (*Id.* ¶ 6.)

The MPA membership also elects a fifteen (15) member Executive Board.  (*Id.* ¶ 7.) Executive Board members are full-time MPD officers paid salaries by the City of Memphis.  (*Id.* ¶ 8.)  Executive Board members attend one monthly meeting at the MPA and receive a stipend from the MPA for their service.  (*Id.* ¶ 9.)  The Executive Board members do not work at the MPA on a day-to-day basis.  (*Id.* ¶ 10.)  The Executive Board has ultimate authority over the Executive Officers as well as the MPA membership.  (*Id.* ¶ 11.)

Plaintiff has raised a number of additional facts about the MPA and its governance.  The MPA operates according to its duly adopted constitution and by-laws.  (Pl.'s Resp. to Defs.' Statement ¶ 2.)  Executive Board members, including the Sergeant at Arms, attend impromptu meetings, handle employee disputes at their work stations, advise members on disciplinary matters, and counsel members when they are having issues with their supervisors. (*Id.* ¶ 3.) Executive Board members are on call 24 hours a day, 7 days a week to handle issues as they arise.  (*Id.*)  While the members of the Executive Board are not physically present daily at the administrative offices, they are performing work daily for MPA.  (*Id.*)  The MPA also identifies the Executive Officers and the other members of its Executive Board as employees on documents submitted to the Tennessee Board of Labor and Workforce Development. (*Id.* ¶ 6.) Plaintiff emphasizes that the MPA membership elects the Executive Officers and has ultimate authority over the Executive Board, including Executive Officers and the precinct/bureau/division representatives.  (*Id.* ¶¶ 7, 11.)

The MPA also employs a staff of clerical workers who receive a set hourly rate of pay to conduct daily, traditional clerical duties on behalf of the MPA.  (Defs.' Statement of Undisputed

4

Facts ¶ 12.)  At all times relevant to Plaintiff's claims, the MPA employed three (3) full-time office employees: LaDoris Harris (black female), Chassidy Gardner (white female), and Plaintiff Tracy Wright (white female).  (*Id.* ¶ 13.)  The MPA employed Marcia Vaccario (white female) on a part-time basis.  (*Id.*) Clerical staff has never been covered by a Collective Bargaining Agreement with the MPA. (*Id.* ¶ 14.)  The MPA currently employs LaDoris Harris (black female) as the Executive Secretary, Chassidy Gardner (white female) as the Receptionist, and Randie Smalley (white female) as the Executive Assistant.  (*Id.* ¶ 15.)  Smalley (white female) was hired specifically to replace Plaintiff Tracy Wright as the Executive Assistant. (*Id.* ¶ 16.)  Smalley has assumed duties previously assigned to Plaintiff, including organizing all MPA events and managing the administrative duties related to the MPA Charitable Foundation.  (*Id.*)

### B. Plaintiff's Employment at MPA

Plaintiff's official full-time employment start date with MPA was January 1, 2001.  (*Id.* ¶ 17.)[10]  As part of her employment benefits, Plaintiff received paid vacation, sick time, and compensation to cover the cost of health insurance.  (*Id.* ¶ 19.)  Defendants assert that Plaintiff did not have an employment contract with the MPA, though Plaintiff argues that the MPA's salary and benefit scales, its other written policies, and its standard operating procedures constitute an implied contact.  (*Id.* ¶ 20.)   When she first started at the MPA, Plaintiff's duties included answering the phone, filing, running errands, obtaining office supplies, assisting with grievances and lawsuits, and planning special events.  (*Id.* ¶ 21.)   In time Plaintiff assumed

---

[10] It appears to be undisputed that Plaintiff did not remember her exact start date as a full-time MPA employee.  According to Defendants, Plaintiff asked the Executive Board to assign her a start date for purposes of calculating her benefits.  Plaintiff disputes this claim and asserts that she brought the issue to the attention of Defendant Essica Cage-Littlejohn who then made the request to the Executive Board that the MPA assign Plaintiff a start date.  The Court notes this factual dispute for the record.  However, it is not clear to the Court why this dispute is material to the issues presented at summary judgment.

responsibility for handling the MPA sponsored dental and vision insurance benefits and supplemental life insurance. (*Id.*)

LaDoris Harris was hired as a receptionist at the MPA sometime in February 2004 through a temporary agency, and Plaintiff points out that Harris did not become an MPA employee until January 2008. (*Id.* ¶ 22.) When Harris first started at the MPA, she was the lowest paid clerical employee and the only African American. (*Id.* ¶ 23.)[11] After each MPA election, the new administration at the MPA would change things in the MPA office. (*Id.* ¶ 24.) The President and Executive Board had discretion to alter the specific job duties of the clerical staff. (*Id.* ¶ 25.) In the exercise of that discretion, sometime during the summer of 2009, the MPA Executive Board adopted a written policy outlining staff benefits for the full-time office employees, including receptionists and secretaries. (*Id.* ¶ 26.)

At that time, Plaintiff approached then-MPA President J.D. Sewell about her pay. (*Id.* ¶ 27.) Plaintiff questioned whether she was being paid in accordance with the pay scale adopted by the Executive Board. (*Id.*) Although Sewell agreed with Plaintiff that she was not being paid in accordance with the pay scale, Sewell left office before her salary could be adjusted. (Pl.'s Resp. to Defs.' Statement ¶ 27.) Defendants contend that Plaintiff's pay issue had nothing to do with her race, but Plaintiff responds that she was being underpaid at the time, and Harris was being overpaid according to the pay scale. (Defs.' Statement of Undisputed Fact ¶ 28; Pl.'s Resp. to Defs.' Statement ¶ 28.)

## C. Cage-Littlejohn Assumes Supervision of MPA Office Staff

Cage-Littlejohn was elected MPA Vice-President in November 2011 with her term to

---

[11] Plaintiff adds that Harris was the lowest paid employee because her position, receptionist, was the lowest paid position.

begin in January 2012.  (Defs.' Statement of Undisputed Fact  ¶ 29.)  At that time the full-time clerical staff for MPA consisted only of Plaintiff and Harris.  (*Id.* ¶ 30.)  At Cage-Littlejohn's request, Plaintiff and Harris each prepared a written job description of their duties and provided it to Cage-Littlejohn.  (*Id.* ¶ 31.)  Plaintiff indicated to Cage-Littlejohn that she had been considered the office manager by a previous MPA President, so her written job description was titled "Job Description for MPA Office Manager."  (*Id.*)  In February 2012, the MPA Executive Board assigned day-to-day operations of the MPA office, including oversight of the office clerical staff, to Cage-Littlejohn, though Plaintiff points out that this decision is not recorded in the minutes of any Executive Board meeting.  (*Id.* ¶ 32.)

The Executive Board also created a Staff Committee at that time which was to make recommendations regarding all clerical staff related issues to the Executive Committee, though again Plaintiff asserts that this decision is not reflected in the minutes of the Executive Board meetings.  (*Id.* ¶ 33.)  Initially, the Staff Committee was made up of Cage-Littlejohn and eight volunteer Executive Board members, four African American members and four white members.  (*Id.* ¶ 34.)  Cage-Littlejohn recommended to the Staff Committee that Harris receive a promotion and then presented her recommendation to the Executive Committee.  (*Id.* ¶ 35.)  The Staff Committee further recommended that two new job titles be created, Executive Secretary and Executive Assistant.  (*Id.* ¶ 36.)[12]  Harris would serve as Executive Secretary and Plaintiff as Executive Assistant, though Plaintiff again argues that none of these recommendations is

---

[12] As more fully discussed in the Court's merits analysis of Plaintiff's claims, there is evidence in the record suggesting that Plaintiff's job title was already "Executive Assistant" and that the changes in March 2012 gave Harris the new title "Executive Secretary."

supported with documentation. (*Id.*)[13] The Staff Committee further recommended that both clerical positions receive equal pay. (*Id.* ¶ 37.) The Executive Board revised the existing pay scale in March 2012 to reflect the new positions. (*Id.* ¶ 38.)

### D. Plaintiff's 2012 Request for Leave

On March 27, 2012, Cage-Littlejohn sent an email to all the clerical employees noting there would be "a few changes" in the daily operations of the MPA office. (*Id.* ¶ 39.) Cage-Littlejohn requested that the clerical employees abide by the following procedures: (1) turn in a copy of timesheets to the Secretary/Treasurer; (2) give notice (by phone, text, or email) whenever the employee was going to be late or unable to come to work; and, (3) provide notice of any days off. (*Id.* ¶ 40.) The requests were applicable to all MPA office staff. (*Id.* ¶ 41.) While the parties dispute whether there were already employee policies in place, the Staff Committee also drafted written personnel policies that were presented to and subsequently approved by the Executive Board. (*Id.* ¶ 42.) Each member of the MPA office staff was asked to sign a copy of the new policies. (*Id.* ¶ 43.) When she was asked to sign the new policies, Plaintiff noted on the signature page that she had a specific issue in regards to the new sick leave policy due to her on-going medical issues. (*Id.* ¶ 44.) As Plaintiff indicated however, the MPA agreed to accommodate her and agreed that her medical issues would not count towards to the new sick leave policy. (*Id.*)

In the summer of 2012, Plaintiff asked Defendant Mike Williams, the MPA President, for two (2) weeks off due to her medical condition. (*Id.* ¶ 45.) Williams approved the use of her

---

[13] Plaintiff's point about certain decisions being documented in the minutes of the MPA is noted. However, Plaintiff's argument goes to the credibility and weight of the testimony about the decisions and perhaps whether the Executive Board complied with the MPA's by-laws on the recording of minutes. Plaintiff has not shown that a genuine dispute exists over whether the decisions were actually made by the Executive Board.

accumulated time and vacation time to cover the two (2) week leave of absence. (*Id.*) At the time Plaintiff did not voice any concerns about using her benefit time to cover the two weeks leave. (*Id.* ¶ 46.) Plaintiff requested the leave because she was experiencing work-related stress and high blood pressure and was concerned that the high blood pressure would exacerbate her Crohn's disease. (*Id.* ¶ 47; Pl.'s Resp. to Defs.' Statement ¶ 45.) Plaintiff did not seek medical attention or obtain a doctor's note during leave of absences, and the MPA did not request a doctor's note. (Defs.' Statement of Undisputed Fact ¶ 48.)

Almost a year later, Harris was absent from work April 2 through 22, 2013, following the sudden death of her husband. (*Id.* ¶ 50.) Harris utilized three (3) days of bereavement leave, one (1) holiday day, and the remainder as sick time as she was under the care of a doctor and was unable to work in any capacity due to medication she was taking at the time. (*Id.* ¶ 51.)

### E. Plaintiff's 2013 Charge of Discrimination

In May 2013, Plaintiff raised the same concerns about her pay with Cage-Littlejohn that she had previously raised with the former MPA President in 2009. (*Id.* ¶ 53.) Plaintiff explained that she was not being paid in accordance with the 2009 pay scale adopted by the previous Executive Board. (*Id.*) On June 27, 2013, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). (*Id.* ¶ 54.) According to Plaintiff's EEOC intake questionnaire, Plaintiff alleged that on June 6, 2013, the Executive Board "refused to pay according to scale & give back pay." (*Id.* ¶ 55.) According to Plaintiff, "I don't think I wasn't being paid the correct amount because I'm white. I think Ms. Harris was being paid more than she should have because she was black." (*Id.* ¶ 56.) Plaintiff believed that she was being underpaid according to the 2009 salary schedule, and Harris was being paid more. (*Id.* ¶ 57.) Defendants respond that the Executive Board had modified the old pay scale as part of the 2012

reorganization of the MPA clerical staff. (*Id.* ¶ 58.) The EEOC issued Plaintiff a Dismissal and Notice of Rights on August 28, 2014. (*Id.* ¶ 59.)

## F. Alteration in Plaintiff's Job Duties

Plaintiff claims that she requested assistance with her job responsibilities in 2012. (Pl.'s Resp. to Defs.' Statement ¶ 60.) The Staff Committee accommodated her request and assigned some of Plaintiff's job duties to Harris, allowing Plaintiff to work more on the MPA charitable foundation. (*Id.*) Plaintiff even trained Harris to take over some of her duties. (*Id.*) But Harris only assumed responsibility for an MPA member benefit program while Plaintiff continued to perform all of her other job duties. (*Id.*) According to Defendants, Plaintiff requested help and relief in August or September 2013. (Defs.' Statement of Undisputed Fact ¶ 60.) In response to Plaintiff's request, responsibility for the dental and vision benefit program was transferred from Plaintiff to Harris. (*Id.* ¶ 61.) Other work was transferred to Chassidy Gardner (a white female) who was the MPA's full-time receptionist. (*Id.*) Plaintiff maintains that Harris was to take over substantially all of Plaintiff's duties, freeing Plaintiff up to focus only on the charitable foundation and event planning. (*Id.* ¶ 62; Pl.'s Resp. to Defs.' Statement ¶ 61.) Plaintiff also adds that her duty to write grants for the MPA was transferred to Gardner without consulting Plaintiff and after she had filed her EEOC charge. (*Id.*) Defendants assert that all of the changes to each staff member's job duties were approved by the Executive Board, though Plaintiff claims that the changes are not reflected in the minutes of the Executive Board's meetings. (Defs.' Statement of Undisputed Fact ¶ 63.)

On December 9, 2013, Cage-Littlejohn sent an email to all clerical staff, which at the time included Plaintiff, Harris, Gardner, and Vaccario. (*Id.* ¶ 64.) The email referenced "reminders" and read as follows:

Good Morning Ladies, This email will serve as a reminder and notice for a few payroll related issues:
• Turn in all timesheets in a timely manner
• Please give Jeff and me a copy of all timesheets
• Timesheets will reflect actual hours worked
• All overtime must have prior approval
• All other personal issues (Dr. appts, etc.) will be worked out as needed.

Thanks for all that you do!
Essica  (*Id.*)

## G. Denial of Plaintiff's 2013 Request for Travel

Sometime in December 2013, Plaintiff made the request to attend a week long "event type of conference at Nashville" held at the Opryland Hotel.  (*Id.* ¶ 65.)  The Executive Board denied the request.  (*Id.*)  According to Defendants, the Board advised Plaintiff that it would authorize Plaintiff to attend such classes locally but was not willing to spend membership money for Plaintiff to attend a week-long course in Nashville.  (*Id.* ¶ 66.)  Plaintiff adds that in October 2013 Defendant Williams had asked Plaintiff to find a course locally to meet her need for additional training in event planning.  (Pl.'s Resp. to Defs.' Statement ¶ 66.)  However, Plaintiff was unable to find such a course and was not given the opportunity to explain this when the Executive Board denied her request to travel to Nashville.  (*Id.* ¶¶ 66, 68.)  Although Plaintiff had no personal knowledge of other clerical staff attending out-of-town conferences, there is evidence Vaccario, the MPA's part-time receptionist, had traveled to Nashville on MPA business on three separate occasions.  (*Id.* ¶ 67; Defs.' Statement of Undisputed Fact ¶ 67.)  Plaintiff testified in her deposition that she believes the Executive Board denied her request to travel to Nashville because of her EEOC charge.  (*Id.* ¶ 68.)

Around the same time, Plaintiff formally requested a raise and was invited to address the Executive Board on the matter.  (*Id.* ¶ 69.)  In January 2014, Plaintiff addressed the Executive

Board about her pay increase, and the Board denied her request. (*Id.* ¶¶ 71, 72.) Plaintiff adds that the minutes for the January 2014 meeting of the Executive Board did not mention her request for a raise or the Board's decision to deny her the raise. (Pl.'s Resp. to Defs.' Statement ¶ 72.) The only documentation of her request and the denial are emails between Plaintiff and Cage-Littlejohn. (*Id.*)

### H. 2014 Review of Accounting Discrepancies

Sometime in early 2014, a Memphis firefighter brought the issue of possible discrepancies regarding the association sponsored insurance plans to the attention of the MPA. (Defs.' Statement of Undisputed Fact ¶ 73.) Defendants state that in response to the firefighter's report, Cage-Littlejohn asked Harris to conduct an initial review of the MPA sponsored plans. (*Id.* ¶ 74.) As a result of her review, Harris found overpayment discrepancies in the approximate amount of $130,000.00. (*Id.*) Plaintiff disputes Defendants' characterization of the review and the underlying discrepancies. According to Plaintiff, MPA leadership was well aware of the discrepancies related to the Guardian vision and dental program. (Pl.'s Resp. to Defs.' Statement ¶ 74.) Harris's review did not account for all of the other possible reasons for variances, for example, pending civil service appeals, military leave, long-term absences, and errors on the part of Guardian/Digital. (*Id.*) According to Plaintiff, the City of Memphis frequently made other payment errors such as deducting money from a Memphis firefighter for MPA members. (*Id.*) The MPA had a long-standing policy to pay the premiums for members when the City did not deduct the premiums under these kinds of circumstances (*Id.*) The review also revealed discrepancies from the time period after Harris took over responsibility for the vision and dental program. (*Id.*) Harris, however, was not disciplined. (*Id.*)

The parties dispute whether Cage-Littlejohn ever conducted her own review of these

matters. Defendants state that Cage-Littlejohn discussed Harris's review with Harris and then conducted her own review. (Defs.' Statement of Undisputed Fact ¶ 75.) However, Cage-Littlejohn testified in her deposition that she reviewed only the records for the month of January 2014. (Cage-Littlejohn Dep. 76:1-19, Nov. 4, 2015, ECF No. 39-1.) One member of the Executive Board, Carl Craig, also reviewed portions of the records. (Defs.' Statement of Undisputed Fact ¶ 76.) On May 29, 2014, Plaintiff was asked to provide an explanation for the discrepancies to the Staff Committee, which the Committee then relayed to the Executive Board. (*Id.* ¶ 77.)[14]

Plaintiff acknowledged the discrepancies and the fact that other MPA clerical staff members as well as employees of the insurance broker had brought them up before. (*Id.* ¶ 78.) Plaintiff explained that she had corrected what she could. (*Id.* ¶ 79.) Plaintiff adds that the problems with the dental and vision program were well known to Executive Officers, including Defendant Williams and Jeff Herbison, and the Executive Board. (Pl.'s Resp. to Defs.' Statement ¶ 78.) Plaintiff attributes the discrepancies in part to difficulties in reconciling such large numbers of beneficiaries without a functioning database. (*Id.*) The database became functional once the dental-vision-life insurance program was transferred to Harris. (*Id.*) Another source of the discrepancies was data entry errors on the part of the City and Guardian, often taking months to correct. (*Id.*) In fact, Plaintiff had previously advised Harris of the need to audit the Guardian dental and vision program based on discrepancies Plaintiff had found in the life insurance program. (*Id.*)

---

[14] Defendants' actually contend that both Plaintiff and Harris were asked to account for the discrepancies. However, the evidence cited to support the contention only shows that Plaintiff was required to explain the matter and was warned that the MPA was considering disciplinary action against her.

In the summer of 2014, the MPA Executive Board asked the MPA's outside accounting firm to conduct a review of the MPA sponsored insurance plans. (Defs.' Statement of Undisputed Fact ¶ 80.)[15] The CPA firm's report of its findings specifically disclaimed that it had performed an audit. (Pl.'s Resp. to Defs.' Statement ¶ 80.) In fact, the evidence shows that the CPA firm reviewed only one month of data and specifically cautioned against its use for determining prior error rates or future error rates. (*Id.*) The discrepancies found by the CPA firm related only to May 2014, a month when Harris was solely responsible for the Guardian benefit program. (*Id.*) Even so, Cage-Littlejohn testified in her deposition that the CPA firm had conducted a full audit and discovered discrepancies that were years old. (Defs.' Statement of Undisputed Fact ¶¶ 81, 82.)

## I. Plaintiff's Termination from MPA

On June 11, 2014, Plaintiff was relieved of her duties at the MPA. (*Id.* ¶ 83.) Plaintiff was expecting a mileage reimbursement check on that particular day. (*Id.* ¶ 84.) When Plaintiff did not receive her check, she asked the Secretary-Treasurer about it and was told that Cage-Littlejohn had the check. (*Id.* ¶ 85.) Plaintiff asked Cage-Littlejohn about the check, and Cage-Littlejohn confirmed that there as an issue with the check and that she needed to discuss it with the Executive Board the next day. (*Id.* ¶ 86.) According to Cage-Littlejohn, she wanted to discuss Plaintiff's check (and another reimbursement check) with the Board because Plaintiff's check was for a large amount. (*Id.* ¶ 87.) Plaintiff denies that Cage-Littlejohn told her that the

---

[15] Cage-Littlejohn called the accounting firm's work an "audit." Cage-Littlejohn Dep. 60:5-13. The MPA's letter to Plaintiff dated July 30, 2014, summoning Plaintiff to a meeting of the Executive Board, described the accounting firm's work as "an official review." Letter July 30, 2014, ex. 10 to Cage Littlejohn Dep. (ECF No. 39-2). The parties also dispute whether the full Executive Board received the results of the CPA firm's review. Cage-Littlejohn testified that she presented the results to the Board. Plaintiff answers that the minutes from the board meeting do not support Cage-Littlejohn's claim.

check was being withheld due to the amount of the check. (Pl.'s Resp. to Defs.' Statement ¶ 87.) At that point, Plaintiff contacted an Executive Board member to discuss the issue and then went back to Cage-Littlejohn. (Defs.' Statement of Undisputed Fact ¶ 88.) Plaintiff again questioned why she could not receive the check. (*Id.* ¶ 89.) Cage-Littlejohn restated that she wanted to bring the check to the attention of the Executive Board at a meeting the next day. (*Id.* ¶ 90.)

Plaintiff responded by telling Cage-Littlejohn that until the "check thing" was settled, she did not feel comfortable running office errands in her personal vehicle. (*Id.* ¶ 91.) Plaintiff also told Cage-Littlejohn that once the issue was settled by the Executive Board, she wanted the Board's decision in writing. (*Id.* ¶ 92.) Plaintiff perceived Cage-Littlejohn's tone and actions as "snippy." (*Id.* ¶ 93.) Defendant Williams heard the exchange and came out of his office to ask what was going on. (*Id.* ¶ 94.) Plaintiff followed Williams into his office and explained that she was "tired of the crap around here with Essica" and was "tired of being treated that way" and the "junk with Essica had been going on for years . . . and he had done nothing about it." (*Id.* ¶ 95.) Cage-Littlejohn joined the discussion, but the parties disagree over whether Plaintiff restated that she would not run that day's office errands until the reimbursement check issue was settled. (*Id.* ¶ 97.) Plaintiff indicated that she was not feeling well and needed to leave the office. (*Id.* ¶ 98.)

Williams and Cage-Littlejohn discussed the matter and determined that it would be best to relieve Plaintiff of her duties right away. (*Id.* ¶ 99.) Cage-Littlejohn informed Plaintiff that she was being relieved of duty with pay and that the Executive Board would discuss the matter the following day and let her know what was decided. (*Id.* ¶ 100.) Plaintiff returned all MPA property, retrieved her belongings, and left without saying anything to anyone. (*Id.* ¶ 101.) On July 30, 2014, the MPA sent Plaintiff a certified letter outlining the grounds for her suspension and requesting her attendance at the Executive Board meeting scheduled for August 7, 2014. (*Id.*

¶ 102.)   The letter advised Plaintiff that she would be given an opportunity to present her position on the insurance discrepancies and the June 11, 2014 incident of insubordination during the Board meeting, though Plaintiff denies that she was insubordinate.  (*Id.* ¶ 103.)

Plaintiff attended the meeting, presented her position, and recorded the executive session. (*Id.* ¶ 104.)   Plaintiff adds that she could not properly respond to the allegations about discrepancies in the insurance payments because she was not given a copy of the CPA firm's review or any other documentation.  (Pl.'s Resp. to Defs.' Statement ¶ 104.)   The Executive Board, which is comprised of both black and white members, unanimously voted to terminate Plaintiff's employment for negligence and insubordination.   (Defs.' Statement of Undisputed Fact ¶ 106.)[16]   Plaintiff received notice of the Executive Board's decision by letter dated August 12, 2014.  (*Id.* ¶ 105.)  The MPA offered Plaintiff the opportunity to resign in lieu of termination, which Plaintiff rejected.  (*Id.* ¶ 108.)

### *J. Plaintiff's 2014 Charge of Discrimination*

On August 14, 2014, Plaintiff filed a second charge with the EEOC claiming retaliation. (*Id.* ¶ 109.)   Plaintiff's charge alleged that she was "forced to swap days when overtime was worked," "swap" time being accumulated time off.  (*Id.* ¶ 110.)  Plaintiff acknowledged that she had twice requested to attend non-MPA sponsored weekend race events outside her normal weekly working hours as "research" for her MPA charitable foundation event planning responsibilities.  (*Id.* ¶ 111.)  Both events occurred outside of Plaintiff's normal work hours.  (*Id.* ¶ 112.)  The MPA granted Plaintiff permission to attend both events but would not authorize

---

[16] Plaintiff disputes the unanimity of the vote and cites for support a roll call sheet (ECF No. 47-13) used during the meeting to record the votes.   The roll call shows that two board members did not vote yes or no on the question.   The exhibit does not indicate whether the two members voted at all.   Nevertheless, the exhibit shows that no member of the board voted against the motion to terminate Plaintiff.

overtime for her attendance. (*Id.* ¶¶ 113, 114.) Instead the MPA told Plaintiff she could swap a normal work day at the MPA office in exchange for the day that she wanted to attend the non-MPA sponsored race. (*Id.*) Plaintiff responds that pursuant to MPA policy, an employee had the option to use swap (or accumulated) time or receive overtime pay.

According to Plaintiff's narrative complaint provided to the EEOC, Cage-Littlejohn had "been the worst about racist comments and actions against" Plaintiff. (*Id.* ¶ 115.) When asked about the specific "racist comments" Cage-Littlejohn made, Plaintiff could only offer a single anecdote in which Cage-Littlejohn said her son had spent the night with a friend who is white. (*Id.* ¶ 116.) According to Plaintiff, Cage-Littlejohn's son asked his mother why she never made a particular food (white gravy) he had eaten at his friend's house, and Cage-Littlejohn responded that the particular food was a "white person thing. Black people don't make that." (*Id.*) This was the only example of a racial comment by Cage-Littlejohn Plaintiff could cite. (*Id.* ¶ 117.)

With respect to Defendant Mike Williams, Plaintiff commented that she had "seen some things that he has done that I do - - that make me wonder…if he's a racist." (*Id.* ¶ 118.) Plaintiff perceived that Williams treated Harris differently than anyone else in the office, though she admitted he was always respectful to Vaccario as well. (*Id.* ¶ 119.) Plaintiff testified that an example of Williams's possibly racist feelings was that he might walk by Plaintiff's office door and not say hello to her. (*Id.*) Plaintiff also believed that Williams might be racist because during his campaign for mayor of Memphis, "the main things he was talking about had to do with the African American communities." (*Id.* ¶ 121.)

Plaintiff deemed her work environment "hostile" because there was "just tension in the office." (*Id.* ¶ 120.) Plaintiff adds that the environment changed dramatically once Cage-Littlejohn assumed responsibility for the staff. (Pl.'s Resp. to Defs.' Statement ¶ 120.) When

Plaintiff was off for medical reasons, Cage-Littlejohn arbitrarily changed her hours without discussing it with Plaintiff. (*Id.*). After Plaintiff filed her first EEOC charge, the tension in the office increased. (*Id.*) For example, both Cage-Littlejohn and Williams did not to speak to her, and Cage-Littlejohn held staff meetings without Plaintiff and blamed everything that went wrong in the office on Plaintiff. (*Id.*) Plaintiff testified in her deposition that she does not want to return to work at the MPA under the current administration. (Defs.' Statement of Undisputed Fact ¶ 122.) Plaintiff also testified that she had applied for other jobs while she was still working for the MPA. (*Id.* ¶ 123.)

## II. Plaintiff's Statement of Additional Facts

Pursuant to Local Rule 56.1(b)(3), a non-moving party may file a "concise statement of any additional facts that the non-movant contends are material and as to which the non-movant contends there exists a genuine issue to be tried." Plaintiff has submitted a statement of additional facts as part of her opposition to Defendants' Motions for Summary Judgment, and Defendants have responded. The MPA corporate by-laws require that all of the business conducted by the Executive Committee be transcribed into written minutes. (Pl.'s Statement of Add'l Fact ¶ 2.) The MPA conducted business in executive session without maintaining minutes. (*Id.*) Defendants add that the by-laws also require that MPA meetings be conducted under the rules of parliamentary procedure adopted in Roberts Rules of Order. (Defs.' Resp. to Pl's Add'l Fact ¶ 2.) Parliamentary procedure allows for executive sessions, which are generally conducted in secret and without the keeping of minutes. (*Id.*)

The parties disagree about the applicable salary scale. Plaintiff contends that Cage-Littlejohn disregarded the salary scale adopted by the Executive Board in 2009. (Pl.'s Statement of Add'l Fact ¶ 3; *see also id.* ¶ 7.) Defendants respond that the Executive Board created the new positions of

Executive Secretary and Executive Assistant in 2012. (Defs.' Resp. to Pl's Add'l Fact ¶ 3.) Cage-Littlejohn testified at her deposition that the pay scale was also adjusted as part of the new positions created in 2012. (*Id.*) On the issue of a new pay scale, Defendants cite for additional support two other documents: the minutes from the March 1, 2012 Executive Board meeting (ECF No. 39-2, Page ID 380) and the Staff Committee recommendations to the Board (ECF No. 39-2, Page ID 381). The documents speak for themselves. However, the Court finds that the exhibits, standing alone, do no show that the Board adopted a new pay scale. Rather the exhibits show that the Executive Board adopted the Staff Committee's recommendations to create two new positions for Harris and Plaintiff and to bring Harris's salary in line with Plaintiff's by giving Harris two raises over a period of time. (*Id.*; *see also* Pl.'s Statement of Add'l Fact ¶¶ 4-5, Defs.' Resp. to Pl's Add'l Fact ¶¶ 4-5.)[17]

Plaintiff asserts that Harris was required to meet two conditions in order to receive the second installment of the raise to make her pay equal Plaintiff's: a satisfactory performance evaluation and assumption of job duties from Plaintiff including administrative responsibility for grievances and maintaining the database for the supplemental vision and dental program. (Pl.'s Statement of Add'l Fact ¶ 9.) According to Plaintiff, Cage-Littlejohn sought and received

---

[17] Plaintiff goes on to assert that the recommendation to create the new positions was Cage-Littlejohn's and not the recommendations of the full Staff Committee. (Pl.'s Statement of Add'l Fact ¶ 6.) Plaintiff further asserts that the March 1, 2012 minutes for the Executive Board meeting do not reflect that the board created the new positions. (*Id.*) The parties have made the minutes a part of the record, and the minutes say what they say: the Executive Board approved the recommendations of the Staff Committee to create two new positions and equalize Harris's pay with Plaintiff's. Plaintiff's statement about the minutes and the recommendations of the Staff Committee are at best Plaintiff's characterization of the exhibits. Plaintiff has not shown, however, that a genuine dispute exists about what the minutes actually contain.

approval of Harris's second installment even though Harris had not met the prerequisites. (*Id.*)[18] Defendants add that the Executive Board approved the second installment of Harris's raise on October 3, 2013, after her job duties had, in fact, increased. (Defs.' Resp. to Pl's Add'l Fact ¶ 9.)

Plaintiff next asserts that Cage-Littlejohn requested approval from the Executive Board to designate Harris's official hire date as February 2004, even though Harris was an employee of the Quarles Kelly temporary agency from 2004 to 2008. (Pl.'s Statement of Add'l Fact ¶ 10.) Defendants add that Plaintiff herself did not remember her own hire date. As such, the Executive Board adopted a hire date for Plaintiff of January 1, 2001, at the same time that the Board adopted hire dates for Harris and Chassidy Gardner. (Defs.' Resp. to Pl's Add'l Fact ¶ 10.)

Concerning the discrepancies in the MPA payments for member vision and dental insurance, Plaintiff states that the MPA selected Guardian in 2010 as its dental insurance benefits provider to replace Ameritas. (Pl.'s Statement of Add'l Fact ¶ 12.) The MPA experienced problems with the transfer of member data from Ameritas to Guardian. (*Id.* ¶ 13.) Marcia Vaccario, the MPA's part-time receptionist, conducted a review and submitted her report to the Executive Officers in October 2010. (*Id.*) MPA's database was restored and became functional again in the summer of 2013. (*Id.* ¶ 14.) Plaintiff submits that without a functioning database, it was impossible to reconcile the payments to Guardian for the dental, vision, and life insurance benefits programs. (*Id.*) Both Wiliams and Cage-Littlejohn were aware of the issues. (*Id.*)

Defendants add that the database issue did not prevent Vaccario from completing her

---

[18] Defendants respond that Harris's job duties did, in fact, increase, and so the Staff Committee recommended that she receive the second installment on October 3, 2013. (Defs.' Resp. to Pl's Add'l Fact ¶ 9.) However, Defendants have not cited the exact portion of the record supporting their fact contention. Defendants refer to docket entry 47-7 "Bates Stamped 494.) This docket entry consists of 69 pages, mostly transcript excerpts of Plaintiff's deposition and the exhibits to the deposition. None of the pages is actually bates stamped.

review in 2010.  (Defs.' Resp. to Pl's Add'l Fact ¶ 14.)  Plaintiff testified in her deposition that even without the database, she could review reports from the City and match them up with payment invoices to Guardian and Guardian spreadsheets or enrollment forms.  (*Id.*)  Plaintiff did this only occasionally and not with complete accuracy.  (*Id.*)  Once the database was functional again, Plaintiff conducted her own review, found a number of discrepancies, and contacted Guardian to have them corrected.  (Pl.'s Statement of Add'l Fact ¶ 15.)[19]  Plaintiff turned over the responsibility for the Guardian dental, vision, and life insurance program to Harris in September 2013 and advised her to review the information for any discrepancies that should be brought to Guardian's attention.  (*Id.* ¶ 16.)[20]

In September 2013, the Executive Board voted to allow Gardner to attend a grant-writing course that Plaintiff had found and effectively transferred responsibility for grant-writing from Plaintiff to Gardner.  (*Id.* ¶ 18.)  Defendants add that the Executive Board had discretion to determine the specific job duties of each clerical staff employee. (Defs.' Resp. to Pl's Add'l Fact ¶ 18.)

In their Motion for Summary Judgment, Defendants argue that they are entitled to judgment as a matter of law on all of Plaintiff's causes of actions.  With respect to Plaintiff's Title VII claims of discrimination, Defendants argue as a preliminary matter that the MPA does not meet Title VII's definition of an "employer."  The MPA did not have fifteen employees.  The Court should dismiss Plaintiff's Title VII claims for this reason alone.  On the merits of

---

[19] Defendants note that Plaintiff never mentioned a review in her deposition testimony. Be that as it may, Plaintiff has submitted a summary judgment affidavit in which she introduces this fact.  Defendants have not specifically sought to exclude it from the record or shown why the Court should not consider Plaintiff's summary judgment affidavit.

[20] Defendants again attempt to dispute this claim but do not address the fact that Plaintiff has introduced the evidence in her summary judgment affidavit.

Plaintiff's Title VII and § 1981 claims, Defendants argue that Plaintiff cannot make out a prima facie case of reverse discrimination. According to Defendants, Plaintiff has no proof that the MPA was the unusual employer who discriminated against non-minority employees. Plaintiff also cannot show that she suffered a materially adverse action. The denial of Plaintiff's requests for a raise and the MPA's handling of Plaintiff's request for time off do not constitute adverse employment actions. And Plaintiff cannot prove that she was treated differently than Harris, the only similarly situated, non-protected clerical employee at the MPA.

Even if Plaintiff could make out her prima facie claims of discrimination, Defendants argue that the MPA had a legitimate, nondiscriminatory reason for denying Plaintiff's requests for a raise. Plaintiff asked to be paid in accordance with the 2009 pay scales, and the MPA Executive Board had adopted a new pay scale in 2013. As part of a new organizational structure for the MPA clerical employees, Plaintiff and Harris were to be paid at the same rates. The MPA also had a legitimate reason for not allowing Plaintiff to use sick time to cover her two-week absence in 2013. Defendants assert that Plaintiff never notified Defendants that she needed the time off for a medical reason. Plaintiff has no evidence that either of these reasons is pretext for discrimination. Therefore, the Court should grant Defendants judgment as a matter of law on Plaintiff's claims for reverse discrimination under Title VII and § 1981.

Defendants next argue that Plaintiff cannot establish her claim of retaliation. Defendants first deny that Plaintiff engaged in any activity protected under Title VII. While Defendants concede that Plaintiff filed a charge of discrimination with the EEOC in 2013, Plaintiff's belief that Defendants had engaged in reverse discrimination was objectively unreasonable. Plaintiff complained that Defendants had denied her requests for a raise and denied her use of sick time for medical leave. But these allegations do not reasonably suggest that Defendants had

discriminated against Plaintiff on the basis of her race. Defendants further argue that Plaintiff cannot prove a causal connection between her EEOC charge filed in June 2013 and her termination in 2014 based on temporal proximity alone. And even if Plaintiff could make out a prima facie claim of retaliation, Defendants had a legitimate reason for her termination. Plaintiff was fired for negligence in her administration of the Guardian insurance benefits and for insubordination. Plaintiff cannot show that either ground for her dismissal was pretextual. Therefore, Defendant are entitled to summary judgment on the claims.

This leaves only Plaintiff's claims under Tennessee law. Defendants request that the Court decline to exercise supplemental jurisdiction over Plaintiff's state law claims. On the merits, Plaintiff cannot establish her claim for breach of contract and promissory estoppel. Plaintiff was an at-will employee of the MPA and has not proof that the parties ever had an implied employment contact. Therefore, these claims are subject to dismissal.

Plaintiff has responded in opposition to Defendants' Motion for Summary Judgment. First, Plaintiff counters that a jury could find that the MPA had fifteen or more employees and therefore satisfied Title VII's numerosity requirement. Plaintiff asserts that each member of the MPA Executive Board had an employment relationship with the MPA. On the merits of her reverse discrimination claim, Plaintiff contends that she can prove background evidence of reverse discrimination based on the fact that Cage-Littlejohn who is African American took adverse action against her. Plaintiff also argues that she suffered adverse actions in the form of the denial of her requests for raises, Defendants' decision to deny her use of sick leave in May 2012, and ultimately her termination. Plaintiff can also show that she and Harris were similarly situated and Defendants treated Harris differently. Defendants decided to increase Harris's pay at the same time that Defendants denied Plaintiff's requests for raise commensurate with the

2009 pay scale.

Plaintiff goes on to argue that Defendants' proffered reasons for these adverse actions are pretext for discrimination. Plaintiff asserts that she was never told the 2009 pay scale no longer applied or that she was not going to be paid under the terms of the pay scale. Plaintiff can also show that she was actually sick in May 2012 when she requested sick leave but was forced to take other paid time off in lieu of sick leave. And as far as her termination, Defendant never disciplined Harris for her culpable role in the losses from the Guardian insurance program even though the review of the program was limited to a single month when Harris and not Plaintiff had responsibility for the administration of the program. Therefore, Plaintiff can show that Defendants' proffered reasons had no basis in fact.

Turning to her retaliation claim, Plaintiff argues that she can make out a prima facie case. Plaintiff's act of filing an EEOC charge constituted protected activity, Defendants' argument to the contrary notwithstanding. Plaintiff can show that Defendants took a number of adverse actions against her following her protected activity: the removal of her grant-writing responsibilities, the denial of her requests for a raise, engaging in a review of the Guardian benefit program, requiring Plaintiff to use "swap" time instead of paying her overtime, suspending Plaintiff for insubordination, and finally terminating her employment. These actions together with proof that Defendants did not speak to Plaintiff, held meetings without Plaintiff, and placed blame for office problems with Plaintiff all establish an inference of retaliation. Plaintiff argues that some of the adverse actions followed as little as two months after she filed her EEOC charge, thereby establishing temporal proximity and a causal connection between her protected activity and the adverse actions. Plaintiff also argues that each of Defendants' proffered reasons for the adverse actions had no basis in fact. Therefore, the Court should deny

Defendants' Motion for Summary Judgment on Plaintiff's retaliation claim.

Finally, Plaintiff argues that she can establish her pendent state law claims. Plaintiff's breach of contract claim is based on her theory of an implied contract springing from the MPA employee handbook. According to Plaintiff, the handbook language on salary and benefits was mandatory and demonstrated the MPA's intent to be bound by the terms. Therefore, genuine issues of material fact remain as to Plaintiff's breach of contract claim.

Defendants have filed a reply brief. On the employer numerosity issue, Defendants argue that members of the Executive Board were final decisionmakers who acted as directors for the MPA. They should not count as employees. Concerning the reverse discrimination claims, Defendants maintain that the decisionmaker in Plaintiff's adverse action was the Executive Board itself, which was composed of an equal number of African American and white members. Defendants argue that Plaintiff has failed to establish the background circumstances to support her claim. Plaintiff has no proof that the MPA's decision to give Harris a new job title and make her pay equal to Plaintiff's was a pretext for discrimination. Defendants also maintain that Plaintiff requested time off in May 2012 to "de-stress" for the sake of her blood pressure. Plaintiff did not complain about using her other paid time off before using sick time to accommodate her request for the time off. Defendants go on to reiterate most of their arguments about their legitimate grounds for taking each action Plaintiff complains of and their arguments for the dismissal of Plaintiff's retaliation claim.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that a party is entitled to summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law."[21]   The Supreme Court has stated that

"[t]hough determining whether there is a genuine issue of material fact at summary judgment is a

question of law, it is a legal question that sits near the law-fact divide."[22]   In reviewing a motion

for summary judgment, the evidence must be viewed in the light most favorable to the

nonmoving party,[23] and the "judge may not make credibility determinations or weigh the

evidence."[24]   When the motion is supported by documentary proof such as depositions and

affidavits, the nonmoving party may not rest on his pleadings but, rather, must present some

"specific facts showing that there is a genuine issue for trial."[25]   It is not sufficient "simply [to]

show that there is some metaphysical doubt as to the material facts."[26]  These facts must be more

than a scintilla of evidence and must meet the standard of whether a reasonable juror could find

by a preponderance of the evidence that the nonmoving party is entitled to a verdict.[27]   In this

Circuit, "this requires the nonmoving party to 'put up or shut up' [on] the critical issues of [his]

asserted causes of action."[28]

    When determining if summary judgment is appropriate, the Court should ask "whether

---

[21] Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Canderm Pharmacal, Ltd. v. Elder Pharms, Inc.*, 862 F.2d 597, 601 (6th Cir. 1988).

[22] *Ashcroft v. Iqbal*, 556 U.S. 662, 674 (2009).

[23] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[24] *Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994).

[25] *Celotex*, 477 U.S. at 324.

[26] *Matsushita*, 475 U.S. at 586.

[27] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

[28] *Lord v. Saratoga Cap., Inc.*, 920 F. Supp. 840, 847 (W.D. Tenn. 1995) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989)).

the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-side that one party must prevail as a matter of law."[29]  Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[30]

<u>**ANALYSIS**</u>

The Court holds that Defendants are entitled to judgment as a matter of law on Plaintiff's Title VII claims and claims under 42 U.S.C. § 1981.  The Court considers each of Plaintiff's theories of recovery separately.

**I. Title VII's Employee-Numerosity Requirement**

Before reaching the merits of Plaintiff's Title VII claim, the Court first considers whether the MPA satisfies Title VII's definition of an "employer."  Title 42 U.S.C. § 2000e(b) defines an "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year."[31]  The Supreme Court has referred to this definition as an "employee-numerosity requirement" and held that for purposes of satisfying the requirement, "all of the individuals with whom an employer has an employment relationship are 'employees' of that employer."[32]  In *Walters v. Metropolitan Educational Enterprises, Inc.*, Justice Scalia writing for

---

[29] *Anderson*, 477 U.S. at 251–52.

[30] *Celotex*, 477 U.S. at 322.

[31] 42 U.S.C. § 2000e(b).

[32] *Walters v. Metro. Educ. Enters, Inc.*, 519 U.S. 202, 206 (1997) (adopting the "payroll method" for testing whether an employer satisfies Title VII's employee-numerosity requirement).

a unanimous court adopted "payroll method" as the most expedient means of assessing the existence of an employment relationship. [33] The determination simply turned on "whether the employee started or ended employment during that year and, if so, when," and each person so employed counted "as an employee for each working day after arrival and before departure."[34]

This relatively straightforward inquiry avoided turning "the coverage determination into an incredibly complex and expensive factual inquiry" where parties spent months reviewing

> payroll registers, timecards, work diaries, and other timekeeping records to determine, for each working day of a 2–year period, how many employees were at work, how many were being paid on salaries, how many were on paid holiday leave, how many were on paid vacation leave, and how many were on paid sick leave.[35]

Nevertheless, even under the payroll method, the law of principal and agent still applies. "[A]n individual who appears on the payroll but is not an 'employee' under traditional principles of agency law would not count toward the 15–employee minimum."[36]

Defendants argue that the MPA did not meet Title VII's 15-employee minimum to be considered an "employer." Defendants reckon that the MPA had employment relationships with only seven people: the MPA's three Executive Officers and the four members of the MPA clerical staff, all of whom performed daily tasks in the MPA office. Plaintiff responds that in addition to these seven employees, the Court should also consider as employees the 15 members

---

[33] *Id.* at 211.

[34] *Id.*

[35] *Id.*

[36] *Id.* (citing *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323–324 (1992)).

of the MPA Executive Board as well as the Sergeant at Arms, an Executive Officer of the MPA who did not actually work in the MPA office on a daily basis. Plaintiff cites a number of additional facts about the work performed by the Executive Board on behalf of the MPA and the fact that the MPA issued Executive Board members a W-2 instead of a 1099 for federal income tax purposes and counted Executive Board members as employees in its filings with the Tennessee Department of Labor and Workforce Development.

The Court holds that a genuine dispute exists over whether the MPA had employment relationship with a minimum of 15 employees in the current or preceding calendar year. At bottom the employee-numerosity requirement is "an essential element of a claim" under Title VII, and not a jurisdictional issue.[37] Consequently, the employee-numerosity requirement is a question of fact, and, where the facts are contested, a jury question.[38] Viewing the evidence in the light most favorable to Plaintiff, members of the Executive Board attend regular board meetings and direct the business of the MPA. Other evidence shows that the Executive Board members also perform various duties and remain on-call to assist MPA members with grievances and other workplace disputes. Although the testimony about the extent of these duties is somewhat vague, a reasonable juror could conclude that Executive Board members are more than merely the directors of the MPA's affairs.[39] Perhaps most importantly, Executive Board members received a "paycheck" for their MPA-related duties, which the MPA reported on a W-2

---

[37] *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006).

[38] *Id.* ("If satisfaction of an essential element of a claim for relief is at issue, however, the jury is the proper trier of contested facts.").

[39] *Cf. Chavero v. Local 241, Div. of the Amalgamated Transit Union*, 787 F.2d 1154, 1157 (7th Cir. 1986).

for federal income tax purposes.[40]   The proof also shows that the MPA counted Executive Board members as employees in their filings with the state of Tennessee.  While none of the evidence is dispositive, the Court concludes that Plaintiff has adduced more than a scintilla of proof to show that the MPA had an employment relationship with the 15 members of the Executive Board. Therefore, Defendants' Motion for Summary Judgment is **DENIED** as to this issue.

## II. Title VII and 1981: Reverse Discrimination

Turning to the merits of Plaintiff's reverse discrimination claims, Defendants first seek summary judgment on Plaintiff's claims for reverse race discrimination under Title VII and 42 U.S.C. § 1981.  Title VII makes it an "unlawful employment practice for an employer . . . to discriminate against any individual . . . because of [his] race, color, religion, sex, or national origin."[41]   Title VII has as its overarching purpose to make the workplace "an environment free of discrimination, where race is not a barrier to opportunity."[42]   Section 1981 also provides "a federal remedy against discrimination in private employment on the basis of race."[43]   Section 1981 "prohibits intentional race discrimination in the making and enforcing of contracts involving both public and private actors," including "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."[44]   Whether a plaintiff seeks relief for employment discrimination under Title VII or section 1981, the Sixth Circuit analyzes both claims under the same

---

[40] Wright Dep. 50:20-52:3, Oct. 28, 2015 (ECF No. 47-7).

[41] 42 U.S.C. § 2000e–2(a)(1).

[42] *Ricci v. DeStefano*, 557 U.S. 557, 580 (2009).

[43] *Johnson v. Ry. Express Agency, Inc.,* 421 U.S. 454, 459-460 (1975).

[44] *Amini v. Oberlin College*, 440 F.3d 350, 358 (6th Cir. 2006) (other citations omitted).

standards.[45]

In order to prove her reverse discrimination claim, "a plaintiff must either present direct evidence of discrimination or introduce circumstantial evidence that would allow an inference of discriminatory treatment."[46] There is no direct evidence of discrimination in this case, and so Plaintiff must establish her claim by means of circumstantial evidence. "Circumstantial evidence . . . is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred."[47] Where as here a plaintiff offers only circumstantial evidence of unlawful discrimination, the Court analyzes the case using the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[48]

Under the *McDonnell Douglas* standard, Plaintiff bears the initial burden to make out a *prima facie* case of reverse discrimination by proving the following elements: (1) background circumstances to support the suspicion that the defendant is that unusual employer who discriminates against the majority; (2) the plaintiff was qualified for the job; (3) the plaintiff suffered an adverse employment action; and (4) the plaintiff was treated differently than similarly situated, non-protected employees.[49] "Under the *McDonnell Douglas* burden-shifting framework, once a plaintiff makes out a *prima facie* case, the burden shifts to the defendant to

---

[45] *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 512 (6th Cir. 2009) ("[W]e review § 1981 claims under the same standard as Title VII claims.").

[46] *Johnson v. Kroger Co.*, 319 F.3d 858, 864–65 (6th Cir. 2003).

[47] *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 811 (6th Cir. 2011).

[48] *Dodd v. Donahoe*, 715 F.3d 151, 156 (6th Cir. 2013) (citation omitted).

[49] *Leavey v. City of Detroit*, 467 F. App'x 420, 424 (6th Cir. 2012).

articulate a non-discriminatory explanation for the employment action, and if the defendant does so, the burden shifts back to the plaintiff to prove that the defendant's explanation is pretextual."[50]  Plaintiff's claim of reverse discrimination is based on three discrete acts: Defendants' failure to bring Plaintiff's salary in line with the 2009 pay scale adopted by the MPA; Defendants' requirement that Plaintiff exhaust accumulated leave during medical-related absences; and Defendants' decision to terminate Plaintiff's employment.  Each action occurred at different times and under different circumstances during Plaintiff's employment with the MPA. As such, the Court considers each claim in turn.

## A. Termination

For purposes of summary judgment, the Court assumes without deciding that Plaintiff can make out the first three elements of her reverse discrimination claim based on her termination.  First, Plaintiff has shown background circumstances to support the suspicion that the MPA is the unusual employer who discriminates against the majority.  The Sixth Circuit has held that "the mere fact that a racial minority took an adverse action against a [non-minority plaintiff] is sufficient to satisfy the background circumstances requirement."[51]  Plaintiff has shown that Cage-Littlejohn and Williams, both African Americans, made the decision to suspend her and recommend her termination to the Executive Board.[52]  Under a cat's paw theory of

---

[50] *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011).

[51] *Leavey*, 467 F. App'x at 425; *see also Zambetti v. Cuyahoga Cmty. Coll.*, 314 F.3d 249, 257 (6th Cir. 2002); *Arendale v. City of Memphis*, 519 F.3d 587, 603 (6th Cir. 2008); *Morris v. Family Dollar Stores of Ohio, Inc.*, 320 F. App'x 330, 339-40 (6th Cir. 2009).

[52] Just as they did in their Rule 12(b)(6) motion to dismiss, Defendants argue that Plaintiff cannot prove background circumstances to support the suspicion that the MPA is the unusual employer who discriminates against the majority.  Defendants' argument must again be rejected because it ignores the clear precedent set by the Court of Appeals.

liability, an employer can be liable for the discrimination of a supervisor even if the supervisor is not an ultimate decisionmaker.[53] The Sixth Circuit has explained that a cat's paw theory is based a supervisory "employee's ability to influence the ultimate decisionmaker."[54] Although Defendants point out that the Executive Board was the final decisionmaker in Plaintiff's termination, it is undisputed that the Board acted on information provided by Williams and Cage-Littlejohn. In fact, Cage-Littlejohn signed Plaintiff's suspension letter dated July 14, 2014, and the termination letter dated July 30, 2014. This proof satisfies Plaintiff's burden to establish this first element.

The second and third elements of Plaintiff's discrimination claim are easily met. The parties agree that Plaintiff was qualified for her job,[55] and Plaintiff's termination was clearly an adverse employment action. "An adverse employment action in the context of a Title VII discrimination claim is a materially adverse change in the terms or conditions of employment because of the employer's actions."[56] "Termination, decrease in wage or salary, change in title, diminished material responsibilities, or a material loss of benefits are all examples of a materially

---

[53] *Staub v. Proctor Hosp.*, 562 U.S. 411 (2011).

[54] *Chattman v. Toho Tenax Am., Inc.,* 686 F.3d 339 (6th Cir. 2012).

[55] Defendants actually state in their reply brief that while they do not contest Plaintiff's qualifications for her job, her termination was "based in part upon Plaintiff's negligent performance of her duties . . . ." Defs.' Reply 11 (ECF No. 52). The Sixth Circuit has held that in anti-discrimination cases district courts should assess whether the plaintiff is "otherwise qualified" for her position at the *prima facie* stage without considering the employer's legitimate, nondiscriminatory reason for its adverse action against the plaintiff. *White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 242 (6th Cir. 2005) (applying rule in Title VII sex discrimination case).

[56] *Kuhn v. Washtenaw Cnty.,* 709 F.3d 612, 625 (6th Cir. 2013) (internal quotation marks omitted).

adverse change."[57]

The Court holds that Plaintiff's discrimination claim based on her termination fails, however, on the final element and the absence of proof that Plaintiff was treated differently than a similarly situated, non-protected employee. Plaintiff's only non-protected comparator in the MPA office was Ladorris Harris. Plaintiff argues that both she and Harris worked on the member insurance program (albeit at different times), that overpayments related to the program occurred during both of their separate tenures, and that the MPA fired Plaintiff but took no action against Harris.

The Sixth Circuit has held that in order to establish disparate treatment, a "plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment."[58] Rather Plaintiff's burden is to show that she and her comparator are similarly situated in "all relevant respects."[59] In the context of disparate disciplinary treatment, the Sixth Circuit has explained that "the plaintiff and his proposed comparator must have engaged in acts of 'comparable seriousness.'"[60] As part of its analysis of this element, the Court must examine "certain factors, such as whether the individuals have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of

---

[57] *Mensah v. Mich. Dept. of Corrections*, 621 F. App'x 332, 334 (6th Cir. 2015).

[58] *Martinez v. Cracker Barrel Old Country Store, Inc.*, 703 F.3d 911, 916–17 (6th Cir. 2013) (quoting *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 352 (6th Cir. 1998)).

[59] *Id.* at 917 (citations omitted).

[60] *Id.* (citation omitted).

them for it."[61]

In this case Plaintiff cannot show that Defendants treated her differently because there is no proof Harris engaged in acts of comparable seriousness. Plaintiff focuses on each employee's role in administering the member insurance program. Importantly, however, Defendants gave two reasons for terminating Plaintiff: her negligence in handling the member insurance program and insubordination. With respect to possible insubordination, Plaintiff disputes that she was insubordinate in June 2014 when she expressed her disagreement with Cage-Littlejohn and Williams over a mileage reimbursement check. But it is undisputed that Plaintiff complained to Williams about "the crap around here with Essica" and then stated she needed to leave the office. Whatever else occurred during this episode, Plaintiff has adduced no proof of Harris having a verbal disagreement with an Executive Officer in the workplace and not receiving discipline for it. Plaintiff's claim of disparate treatment based on her termination fails for this reason alone.

Furthermore, Plaintiff has no proof that Harris engaged in comparable conduct in her administration of the member insurance program and nevertheless received disparate treatment. Plaintiff acknowledges that discrepancies existed in the program dating back to her own tenure over the program. Plaintiff provides her own explanations for the sources of the problems and testified that MPA Executive Officers were aware of the issues for years. Plaintiff also emphasizes that by the time the MPA requested an outside review of the insurance payments from its accounting firm, Harris, and not Plaintiff, had taken over for the program. The accounting firm conducted a review of the system but limited its analysis to the month of May 2014, a month when Harris, and not Plaintiff, would have been responsible for the administration of the insurance program.

---

[61] *Id.* (citation omitted).

Even viewing this evidence in a light most favorable to Plaintiff, Plaintiff's burden is to prove that she and Harris engaged in substantially similar conduct and were similarly situated in all relevant respects. Accepting as true that the discrepancies had existed for some time and that both Plaintiff and Harris had somehow contributed to the discrepancies, Plaintiff has not shown that both she and Harris engaged in substantially similar conduct. The undisputed fact is that Plaintiff administered the insurance program over a longer period of time. Harris had taken over responsibility for the insurance program from Plaintiff in October 2013. According to Cage-Littlejohn, the MPA believed that the discrepancies went back for years and resulted in significant overpayments to the insurance company. Harris's tenure over the insurance program (and the loss resulting to the MPA) was only a matter of months while Plaintiff had administered the program for years. Plaintiff has simply not shown that Harris's conduct or possible culpability for the problems was as serious as her own. These differentiating factors preclude a finding that Harris and Plaintiff were similarly situated or that Defendants engaged in disparate treatment.[62]

Even if Plaintiff had made out her prima facie termination claim, Defendants have proffered a legitimate, nondiscriminatory reason for firing Plaintiff. The reasons given for Plaintiff's termination were insubordination and negligence, both of which constitute legitimate grounds for termination.[63] At this stage of the burden-shifting analysis, Plaintiff must show that

---

[62] *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1116 (6th Cir. 2001) (considering "severity and frequency" of conduct to be differentiating circumstances).

[63] *Basch v. Knoll, Inc.*, 619 F. App'x 457, 460 (6th Cir. 2015) (holding that insubordination was a legitimate, nondiscriminatory reason for terminating an employee); *Jones v. Potter*, 488 F.3d 397, 409 (6th Cir. 2007) ("Poor job performance . . .is a perfectly legitimate, legal reason for firing an employee.").

Defendants' proffered reasons were pretext for reverse discrimination. Plaintiff can make this showing by proving one of the following: (1) Defendants' proffered reasons had no basis in fact, (2) Defendants' proffered reasons did not actually motivate the decision to terminate Plaintiff, or (3) Defendants' proffered reasons were insufficient to motivate its decision.[64] Put another way, Plaintiff's burden "is to produce sufficient evidence from which a jury may reasonably reject the employer's explanation" and infer discrimination.[65] Even then summary judgment for the defendant may be appropriate "if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred."[66]

Even assuming Plaintiff could have established a prima facie claim of reverse discrimination, the Court holds that she has not shown that Defendants' given reasons for her termination were pretext. At summary judgment, Plaintiff has questioned the thoroughness of the MPA's review of the member insurance program, particularly the MPA's failure to hold Harris accountable for her role in creating the discrepancies. In other words, Plaintiff has attempted to show that her own negligence or poor performance was insufficient to motivate Defendants' decision to terminate her. "Demonstrating pretext using this method ordinarily consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer

---

[64] *Martinez*, 703 F.3d at 915.

[65] *Lefevers v. GAF Fiberglass Corp.*, 667 F.3d 721, 725 (6th Cir. 2012).

[66] *Griffin v. Finkbeiner*, 689 F.3d 584, 593-94 (6th Cir. 2012) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)).

contends motivated its discharge of the plaintiff."[67]

At the pretext stage, the Court's analysis of the relative conduct of Plaintiff and Harris is a "more rigorous comparison," "focus[ed] on the severity of the differently treated employees' actions."[68] The issue is not simply "whether those actions violated the same company rule or policy" but must also take into account "both the actual and potential consequences of the employee's actions."[69] Plaintiff has not shown that Harris engaged in substantially identical conduct or that the actual and potential consequences of Harris's acts of possible negligence was as severe as the actual and potential consequences of Plaintiff's own owns of negligence. Plaintiff has not attempted to show by a comparative analysis that she and Harris engaged in substantially the same conduct. For the reasons already explained, Plaintiff is unable to survive a "more rigorous comparison" between her role in administering the insurance program and Harris's. Therefore, Defendants' Motion for Summary Judgment is **GRANTED** as to this claim.

## B. Pay and Requests for Raises

Plaintiff next argues that Defendants also took adverse action against her by denying her pay under the terms of the pay scale adopted by the MPA in 2009. The record shows that Plaintiff requested a raise to bring her salary in line with the 2009 pay scale. Plaintiff first addressed the issue to a former MPA president at some time before 2012, brought the issue up again with Cage-Littlejohn in 2013, and then once more requested a raise from the Executive Board in 2014. Notably, Plaintiff raised the issue in her 2013 charge of discrimination,

---

[67] *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 779-80 (6th Cir. 2016) (quoting *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)).

[68] *Id.* (citing *Chattman*, 686 F.3d at 350).

[69] *Id.* (citations omitted).

complaining that Harris was paid more than she would have received under the 2009 pay scale while Plaintiff was paid less.

As far as proving the elements of her disparate pay claim, Plaintiff can show that she was qualified for her job and that the denial of her request for a raise was an adverse action.[70] However, Plaintiff has not proven any background circumstances to prove that the MPA was the unusual employer that engaged in reverse discrimination in terms of pay. The undisputed proof shows that the Executive Board, which had an equal number of black and white members, made the decision to deny Plaintiff's several requests for a raise. Unlike her termination claim, Plaintiff has no evidence that her minority supervisors, Williams or Cage-Littlejohn, influenced the decision of the Executive Board to deny the requests. Although the evidence shows that Plaintiff raised the issue of her salary with Cage-Littlejohn in May 2013, Plaintiff's intake questionnaire with the EEOC specifically alleged that on June 6, 2013, the Executive Board "refused to pay according to scale & give back pay." Likewise, the undisputed proof shows that Plaintiff addressed her request for a raise in 2014 directly to the Executive Board. On this record, the Court finds no evidence then that the Executive Board as "a racial minority took an adverse action against [Plaintiff]" in denying her request for a raise.[71] And Plaintiff has offered no other background evidence to show that the MPA engaged in reverse discrimination against

---

[70] *Lulaj v. Wackenhut Corp.*, 512 F.3d 760, 765 (6th Cir. 2008) (citing *Boumehdi v. Plastag Holdings,* 489 F.3d 781, 791 (7th Cir. 2007) (recognizing that a denial of a raise constitutes a material adverse action); *see also Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) ("[A] tangible employment action would have taken the form of a denial of a raise or a promotion.")

[71] *Leavey*, 467 F. App'x at 425.

white employees with respect to salary and compensation.[72]  The Court concludes that Plaintiff cannot meet this element of her disparate pay claim.

Even if Plaintiff could adduce background evidence of reverse discrimination at the MPA, Plaintiff cannot show that she and Harris were similarly situated in all relevant respects. The undisputed evidence shows that in 2012 the Executive Board approved job titles for Plaintiff ("Executive Assistance") and Harris ("Executive Secretary") and decided to give Harris a raise in two increments and to make her salary equal to Plaintiff's.[73]  The second installment of Harris's raise was based on a transfer of responsibilities from Plaintiff to Harris. The Executive Board adopted these administrative changes at least in part to accommodate Plaintiff's request to give up some of her existing duties and to allow her to focus on other duties related to the MPA's charitable foundation.  Taken together, the fact that Plaintiff gave some of her job duties to Harris and that Harris was assuming a different job title with new responsibilities and that both would work under an equalized salary structure sufficiently differentiates each employee's terms of employment.  In short, viewing the evidence in the light most favorable to Plaintiff, the proof precludes a reasonable finding that the two were similarly situated.

Plaintiff raises a number of fact claims to dispute the proof about the administrative

---

[72] *Johnson v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 502 F. App'x 523, 536 (6th Cir. 2012) (citing *Treadwell v. Am. Airlines,* 447 F. App'x 676, 678 (6th Cir. 2011) (collecting cases on the variety of ways to prove a background of reverse discrimination, including statistical evidence; employment policies demonstrating a history of unlawful racial considerations; evidence that the person responsible for the employment decision was a minority; or general evidence of ongoing racial tension in the workplace.).

[73] Other record evidence shows that Plaintiff's job title had always been "Executive Assistant" and that Harris's job title prior to 2012 was "Receptionist."  Plaintiff cites evidence about the 2009 pay scale, which refers to the "Executive Assistant" and the "Receptionist."  *See* Staff Benefits (ECF No. 47-8, Page ID 1125).  Viewing this evidence in the light most favorable to Plaintiff, only Harris received a "new" job title as part of the administrative changes adopted by the Executive Board in 2012.

changes the Executive Board adopted in 2012. Plaintiff argues that no written job descriptions of the positions of executive assistant and executive secretary exist and that the minutes of the MPA Executive Board do not refer to the proposed job titles as "new" positions. Plaintiff also argues that there is no evidence that 2009 pay scale was ever revised. In fact, Plaintiff claims when she brought up the 2009 pay scale in her request for a raise, she was told to obtain the minutes from the June 2009 board meeting adopting the pay scale. Plaintiff testified that she only discovered that her position was considered "new" for the first time in this litigation.

Even accepting these facts as true, there is no genuine dispute that the Executive Board adopted the recommendation to give Harris a different job title, to transfer some of Plaintiff's responsibilities to Harris, and to equalize their salaries. Defendants have introduced the written recommendations from the Staff Committee (ECF No. 39-2, Page ID 381) listing the positions of "Executive Assistant" and "Executive Secretary." With regard to pay, the recommendations state as follows: "Currently, there is a $5.50/hr difference between the (2) full-time office staff members [Plaintiff and Harris]. The recommendation of the committee is to make an initial adjustment to the lesser salary by $2.75. Once the responsibilities increase, the second adjustment of $2.75 will be made so that the executive salaries are the same."[74] The minutes from the Executive Board meeting on March 1, 2012 shows that Cage-Littlejohn presented the recommendations to the Board, a motion was made to adopt the recommendation, and the Board approved the recommendation by a vote of 14-0. Plaintiff has failed to show that a genuine dispute exists about these facts. What is more nothing about the actions of the Executive Board

_____

[74] Staff Comm. Recommendations, ex. 4 to Cage-Littlejohn Dep. (ECF No. 39-2, Page ID 381). The Court notes that the words on the exhibit are type-written except for the dollar amount of the recommended raises. The typewritten recommendation reads "$2.25" but the figure is struck through and the figure "$2.75" is handwritten under it.

suggests discrimination.  Therefore, Defendants' Motion for Summary Judgment is **GRANTED** as to this claim.

## C. Benefits and Leave

Plaintiff's last claim for reverse discrimination rests on her use of leave, a claim Plaintiff raised in her 2013 EEOC charge.  Once again, Plaintiff can meet the first three elements of the claim with proof that she was qualified for her job, she suffered an adverse action, and there is background evidence to suggest reverse discrimination.  But Plaintiff has still not shown that Harris received more favorable treatment under similar circumstances.  The specifics of this claim are not entirely clear.  Plaintiff claims that Defendants did not allow her to use sick leave for a medical absence in 2012 but then allowed Harris to use leave for bereavement in 2013.  Viewing the evidence in the light most favorable to Plaintiff, the proof shows that Plaintiff requested time off due to stress and concerns about high blood pressure and the possible effects of the stress on her Crohn's Disease.  Plaintiff asserts in conclusory fashion that Defendants' decision to require her to use accumulated time off first and then vacation time and then sick leave violated MPA policy.  Plaintiff has not shown with citations to the record what the policy stated or how it applied to her situation in 2012 or why Defendants' decision violated the policy.  By contrast, Harris' took leave a year later and after the death of her spouse.  At that time, Harris used three days of bereavement leave, one day of holiday time, and the remainder of her absence as sick time.  The undisputed proof shows that Harris was also under the care of a doctor and was taking medication.  Plaintiff has simply not shown how the two situations were comparable or how Defendants' handling of the situations suggests improper discrimination.  Therefore, Defendant's Motion for Summary Judgment is **GRANTED** as to this claim.

## III. Title VII and 1981: Retaliation

Defendant next seeks summary judgment on Plaintiff's claim for retaliation. In order to make out her *prima facie* case of retaliation, Plaintiff must demonstrate the following: (1) that she engaged in protected conduct; (2) that Defendants had knowledge of her protected activity; (3) that Defendants took an adverse employment action against her; and (4) that there was a causal connection between the protected activity and the adverse employment action.[75] A Title VII retaliation claim "must be proved according to traditional principles of but-for causation," which "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."[76]

The Court holds that Defendants are entitled to judgment as a matter of law on the retaliation claim. Plaintiff can easily satisfy the first two elements of her retaliation claim: Plaintiff engaged in protected activity by filing a charge of discrimination with the EEOC on June 27, 2013,[77] and Defendants had knowledge of her protected activity. As for the adverse action, Plaintiff "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."[78] In this respect, the "materially adverse action element of a Title VII retaliation claim is substantially different from the adverse

_____

[75] *Arendale*, 519 F.3d at 606.

[76] *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013).

[77] Defendants argue that Plaintiff's June 2014 charge was not protected activity because Plaintiff's complaint of reverse discrimination was objectively unreasonable. Defendants' argument ignores the plain text of Title VII's anti-retaliation provision and is otherwise without support. 42 U.S.C. § 2000e-3(a) (prohibiting discrimination against an employee "because he has made a charge . . . under this subchapter.").

[78] *Taylor v. Geithner*, 703 F.3d 328, 336 (6th Cir. 2013) (quoting *Garner v. Cuyahoga Cnty. Juvenile Court,* 554 F.3d 624, 639 (6th Cir. 2009)).

employment action element of a Title VII race discrimination claim."[79] "An act that would be immaterial in some situations is material in others."[80] "[A]ctions typically construed as nonmaterial could rise to the level of an adverse employment action when considered in context, such as a change in the work schedule of a young mother with children in school."[81] In short, context matters.

Plaintiff argues that Defendants took a number of adverse actions against her in retaliation for her filing an EEOC charge.[82] Some of the alleged actions, specifically the change in Plaintiff's duties to write grants[83] and the act of reviewing the Guardian insurance program,[84]

---

[79] *Laster v. City of Kalamazoo*, 746 F.3d 714, 719 (6th Cir. 2014) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006)).

[80] *Id.* at 731 (citing *Burlington N.*, 548 U.S. at 59).

[81] *Taylor*, 703 F.3d at 336 (quoting *Burlington Northern,* 548 U.S. 69) ("The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.").

[82] Although the parties have also briefed the evidence surrounding the MPA's denial of Plaintiff's request to travel to a conference in Nashville, Plaintiff has not argued that this amounted to a materially adverse employment action.

[83] *Pettit v. Steppingstone, Ctr. for the Potentially Gifted*, 429 F. App'x 524, 532 (6th Cir. 2011) (citing *Bowman v. Shawnee State Univ.,* 220 F.3d 456, 461–62 (6th Cir. 2000) (holding that only "significantly diminished material responsibilities" amount to a materially adverse action). Plaintiff has adduced no evidence to show that Defendants' decision to take away her responsibility for grant writing and give it to Chassidy Gardner "significantly diminished" Plaintiff's job duties. In fact, Plaintiff has offered no proof to show what the responsibility even entailed or why a reasonable employee could find the change materially adverse.

[84] "Heightened scrutiny of an employee's work between a protected activity and an adverse action can support a causal inference to the extent it suggests the employer scrutinized the employee's work in order to find some reason to take the alleged action." *Johnson v. Donahoe*, --- F. App'x ---, No. 15-5061, 2016 WL 808149, at *6 (6th Cir. Mar. 2, 2016) (citing *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 435–36 (6th Cir. 2009). Here Plaintiff has not shown that Defendants scrutinized the Guardian benefit program for the purpose of finding a reason to

do not constitute materially adverse employment actions. Others, however, were materially adverse, namely denying Plaintiff a request for a raise[85] and suspending and terminating Plaintiff's employment.[86] Thus, Plaintiff has proof to establish this element of her retaliation claim as to these two actions.

Turning now to the fourth element, the Court holds that Plaintiffs has failed to prove a causal connection between her June 2013 EEOC charge and Defendants' decision to deny her a raise in or to terminate her employment in August 2014. "Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation."[87] "But where some time elapses between the employee's protected activity and the adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality."[88] Plaintiff has no such evidence in this case. The undisputed facts show that Plaintiff addressed her request for a raise to the full Executive Board in January 2014, over six months

---

take action against her. Plaintiff does not deny that an outside party, a Memphis firefighter, brought the issue up or that the problems had existed in the program for some time. She only argues that Harris was also responsible for the problems. The fact remains that there is no evidence Defendants undertook a review of the program as a form of retaliation against Plaintiff.

[85] *Jordan v. City of Cleveland*, 464 F.3d 584, 596 (6th Cir. 2006) ("[D]enial of money would more than amply qualify as a materially adverse action to any reasonable employee for Title VII purposes.").

[86] *Dye v. Office of the Racing Com'n*, 702 F.3d 286, 303 (6th Cir. 2012) ("It is elemental that terminations are adverse employment actions.").

[87] *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 650 (6th Cir. 2015) (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008)).

[88] *Id.* (citations omitted).

after filing her charge of discrimination.  Williams and Cage-Littlejohn suspended Plaintiff with pay in July 2014, and the MPA terminated her in August 2014, both a full year after Plaintiff filed her charge with the EEOC.  These adverse actions are simply not close enough in time to Plaintiff's protected activity to show some causal link between the events. [89]  The Court holds then that Plaintiff cannot make out her claim of retaliation.

To surmount this timing problem, Plaintiff has cited additional evidence about Williams and Cage-Littlejohn not speaking to her around the office or holding meetings without her and blaming her for problems in the office.  While Plaintiff does not rely on this proof to establish that any of the perceived slights were in and of themselves adverse actions, she believes that the proof tends to show some causal connection between her protected activity and the adverse actions she did suffer.  The Court disagrees.  Plaintiff has provided only a vague description of the treatment she received without any additional context to show when the acts occurred or the circumstances of the acts.  What is more, Plaintiff has described only general friction that could occur in most any workplace.  In *Burlington Northern*, the Supreme Court commented that in a retaliation case, "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience."[90]  Put another way, "it is important to separate significant from trivial harms."[91]  The Court holds that any evidence of minor slights, real or perceived, does not

---

[89] *Nicholson v. City of Clarksville*, 530 F. App'x 434, 448 (6th Cir. 2013) (concluding that "[a] time period greater than six months, without more, is not a sufficiently short period of time to satisfy the causal connection element of a retaliation claim.").

[90] *Burlington Northern*, 548 U.S. at 68.

[91] *Id.*; *see also Hunter v. Sec'y of U.S. Army*, 565 F.3d 986, 996 (6th Cir. 2009).

support an inference of causation or retaliatory intent. Therefore, Defendants' Motion is **GRANTED** on Plaintiff's retaliation claim.

## IV. Claims under Tennessee Law

The only issue left for the Court's determination is the proper disposition of Plaintiff's claims under Tennessee law. "[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."[92] It is settled law that the district court may exercise supplemental jurisdiction over state law claims, even after the basis for removal to federal court has been eliminated, "if recommended by a careful consideration of factors such as judicial economy, convenience, fairness, and comity."[93] The Sixth Circuit has specifically held that a district court has supplemental jurisdiction "over fee disputes that are related to the main action" of a case or controversy.[94] Still district courts may decline to exercise supplemental jurisdiction over a related claim if

> (1) the claim raises a novel or complex issue of State law,
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.[95]

Generally, if a federal claim is dismissed before trial, the state claims should be dismissed as

---

[92] 28. U.S.C. § 1367(a).

[93] *Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350 (1988).

[94] *Kalyawongsa v. Moffett*, 105 F.3d 283, 287-88 (6th Cir. 1997).

[95] § 1367(c).

well.[96]

The Court has now concluded that Defendants are entitled to judgment as a matter of law on Plaintiff's claims under Title VII and 42 U.S.C. § 1981. Defendants have requested that the Court decline to exercise supplemental jurisdiction over Plaintiff's state law claims. Although Plaintiff has argued the merits of her state law claims, Plaintiff has not addressed Defendants' request for the Court to decline to exercise jurisdiction over the claims. Because the Court has dismissed all of the claims over which it has original jurisdiction, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims. Those claims are therefore dismissed without prejudice.

## CONCLUSION

Defendants' Motion for Summary Judgment is **GRANTED** as to Plaintiff's federal claims for reverse discrimination and retaliation. Plaintiff's state law claims are dismissed without prejudice.

**IT IS SO ORDERED.**

s/ S. Thomas Anderson
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date: July 25, 2016.

---

[96] *Taylor v. First of Am. Bank-Wayne*, 973 F.2d 1284, 1287 (6th Cir. 1992) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966)).